UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LYNETTE BARRETT,               )
                               )
          Plaintiff,           )   Case No. 3:08-0958
                               )   Judge Nixon/Bryant
          v.                   )
                               )   **Jury Demand**
WHIRLPOOL CORPORATION,         )
                               )
          Defendant.           )

<u>**MEMORANDUM AND ORDER**</u>

Defendant Whirlpool Corporation ("Whirlpool") has filed
its motion for summary judgment (Docket Entry No. 41), supported by
the declarations of Willie C. "Buck" Bingham, Linda Blackaby,
William Coe, Fred Contreras, Margaret Goins, J. Douglas Hagewood,
Mark McCool, William R. Westberry, Ricky Gates and the plaintiff's
discovery deposition (Docket Entry Nos. 45, 46, 47, 48, 49, 50, 51,
52, 54, 56 and 62).

Plaintiff has filed her response in opposition (Docket
Entry No. 57) supported by her own declaration (Docket Entry No.
59).

Defendant has filed a reply (Docket Entry No. 60).

Upon consent of the parties, this case has been referred
to the undersigned Magistrate Judge to conduct any and all
proceedings including the entry of judgment, pursuant to 28 U.S.C.
§ 636(c)(1) and Rule 73, Fed.R.Civ.P. (Docket Entry No. 66).

For the reasons stated below, the Court finds that defendant's motion for summary judgment should be granted and that plaintiff's complaint dismissed.

## Statement of the Case

Plaintiff Barrett filed this action in the Chancery Court for Rutherford County, Tennessee, against defendant Whirlpool alleging sexual harassment by fellow employee Mark Watwood and a resulting hostile work environment. Plaintiff asserts causes of action for violations of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-401 et seq., intentional infliction of emotional distress/outrageous conduct, and negligent infliction of emotional distress . Plaintiff seeks compensatory and punitive damages and an award of her attorneys' fees.

Defendant Whirlpool timely removed the case to this court basing jurisdiction upon diversity of citizenship, 28 U.S.C. § 1332(a).

Defendant Whirlpool thereafter filed an answer denying liability (Docket Entry No. 6).

Following discovery, defendant Whirlpool filed its motion for summary judgment.

## Standard of Review

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of

2

law.  See Fed.R.Civ.P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000).  The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

     To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed.R.Civ.P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

3

## Summary of Pertinent Facts

Plaintiff Lynette Barrett was hired by defendant Whirlpool Corporation on October 23, 1984, as an assembler at Whirlpool's manufacturing plant located in LaVergne, Tennessee. (Barrett deposition, p. 9)[1] Plaintiff worked at the Whirlpool plant until August 13, 2008, when she was laid off as the result of the permanent closure of the plant (Id.). This Whirlpool plant was a large manufacturing facility including about one million square feet of floor space. (Barrett depo., p. 10).

After working in other locations in the plant for almost 17 years, plaintiff, on May 14, 2001, accepted a transfer to the dehumidifier ("dehum") line, where she worked with Mark Watwood. (Barnett depo., pp. 28-29). Watwood, like plaintiff, was an hourly employee; he served as team leader of the dehum line. (Barrett depo., p. 32). Plaintiff worked on the dehum line for approximately 4½ months, from May 14 until October 1, 2001. During this time, plaintiff alleges that Watwood committed three physical acts constituting sexual harassment. Watwood once touched plaintiff on her buttocks with his hands when she bent over to pick up some parts, whereupon plaintiff told Watwood that she "would knock him on his ass." (Barrett depo., pp. 77-78). On another occasion, Watwood touched a tattoo on the calf of plaintiff's leg and stated, "my, my, that looks good." (Barrett depo., pp. 80-81).

_____

[1]Plaintiff Barrett's deposition appears in the record as Docket Entry No. 54).

4

Finally, Watwood once grabbed her shirt and attempted to hug her. (Barrett depo., p. 82). Of these three incidents, plaintiff reported only the buttocks-touching incident to her supervisor, Bill Westberry. (Barrett depo., p. 83). When asked at deposition why she did not report to management Watwood's touching her tattoo and attempting to hug her, plaintiff testified: "I don't guess I really thought as much about those being inappropriate as the buttocks grab." (Barrett depo., p. 83). Plaintiff also maintains that during the time she worked on the dehum line, Watwood made certain remarks of a sexual nature, including once when he told her, "If I was alone with you I'd show you what a man feels like." (Barrett depo., pp. 42-44).

After about four and a half months on the dehum line, plaintiff transferred to the quality assurance laboratory ("CAL lab") located in another area of the plant. She sought this transfer for reasons of higher pay and quieter work area, but also to get away from Watwood. (Barrett depo., pp. 31-32). After she moved to the CAL lab from the dehum line, plaintiff was around Watwood "infrequently." (Barrett depo., p. 76).

In 2002, while plaintiff was still working in the CAL lab, she encountered Watwood as she was coming out of the restroom. Plaintiff states that "he butted [her] with his chest, like football players do." (Barrett depo., p. 44). She mentioned this to her supervisor, Mark McCool, and McCool instructed Watwood not

5

to come around the CAL lab any more. (Barrett depo., p. 45).
Plaintiff testified at deposition that McCool's instructions to
Watwood were "pretty much" effective in stopping him from coming
around. (Barrett depo., p. 45).

Next, sometime during the summer of 2003, plaintiff
asserts that as she was leaving work one afternoon she observed
Watwood sitting in the front seat of her car in the parking lot.
(Barrett depo., pp. 87, 90). A fellow hourly employee, Ricky
Gates, asked Watwood to get out of her car, and, after some
argument, Watwood complied. (Barrett depo., p. 88). Plaintiff did
not report this occurrence to Human Resources or management. When
asked at deposition why she did not report this incident, plaintiff
testified: "I don't know. Getting off work in the afternoon, I'm
just ready to go home." (Barrett depo., p. 88). Plaintiff also
testified that, around that same time, Watwood once followed her
after work, but she "took the back roads so he couldn't catch me."
(Barrett depo., p. 89). Plaintiff did not call police or report
this occurrence to Whirlpool management, nor did she tell her
husband about it. (Barrett depo., p. 90).

Plaintiff testified that after the foregoing incidents in
summer 2003 the next incident involving Watwood occurred in spring
2007. (Barrett depo., pp. 56-57). Around that time, two female
employees had undergone breast enlargement surgery, and that
apparently became the topic of at least some conversation among

6

other employees. (Barrett depo., p. 57). Plaintiff contends that she met Watwood in the hallway as she was walking toward the women's bathroom, and that he said to her: "Who was your surgeon?" (Barrett depo., pp. 57-58).

Plaintiff's last encounter with Watwood occurred approximately a couple of months thereafter, when she happened upon him near the BIR line. (Barrett depo., pp. 58-59).

Plaintiff testified that Watwood said to her "something like, those are big 'uns." (Barrett depo., pp. 59-60). Plaintiff understood Watwood's comment to refer to her breasts. (Barrett depo., p. 58). Plaintiff did not report this incident to Whirlpool management. When asked at deposition why she failed to make a report, plaintiff stated: "I don't know."

Watwood's employment at Whirlpool was terminated in October 2007. (Barrett depo., pp. 84-85).

Plaintiff continued to work at Whirlpool until August 13, 2008, when she was laid off shortly before the plant was closed permanently. (Barrett depo., p. 9).

### Analysis

Defendant Whirlpool makes three arguments in support of its motion for summary judgment. First, Whirlpool maintains that plaintiff's claims are barred by the one-year statute of limitations. Second, Whirlpool asserts that the incidents alleged by plaintiff Barrett were not severe or pervasive enough to support

an actionable claim for sexual harassment or infliction of emotional distress. Finally, Whirlpool argues that plaintiff cannot establish that it is vicariously liable for the acts of an hourly employee because plaintiff failed to report most of the alleged incidents with Watwood as required by Whirlpool anti-harassment policies.

The Court will address each of these arguments in turn.

Statute of limitations. Tennessee Code Annotated & 4-21-311(d) provides that any action brought under the Tennessee Human Rights Act "shall be filed in chancery court or circuit court within one (1) year after the alleged discriminatory practice ceases . . . ." Plaintiff's personal tort claims are also subject to a one-year statute of limitations under Tennessee law. See Stewart v. Memphis Housing Auth., 287 F.Supp.2d 853, 858 (W.D. Tenn. 2003); Tenn. Code Ann. § 104(a).

Plaintiff in her deposition testified that the last two incidents with Watwood occurred in 2007. The first of these occurrences, when Watwood allegedly asked plaintiff, "Who was your surgeon?" occurred in the spring of the year, when "it was still kind of cool outside." (Barrett depo., pp. 56-57). After describing this comment, plaintiff was asked about the final incident involving Watwood, and the following exchange occurred:

> Q. Now, was that the last run-in that you had with Mr. Watwood where he made a comment directly to you, prior to his termination?

8

A.    I think there was one other one, but I can't recall.

Q.    What was the one other comment that he made?

A.    Again, it had something to do with the boobs or breast.

Q.    Was that around the same time as the first one?

A.    No.  It was a little while later.

Q.    Was that in the summer?

A.    I don't recall.

Q.    Do you recall if it was the month of August?

A.    I'm not sure.  I'm not sure.

Q.    Do you recall if it was the month of September?  Or July?

A.    I don't – I don't recall the month exactly.

Q.    Approximately how long after the first comment was it?

A.    A couple of months because I tried to stay away from him.

Q.    Approximately two?

A.    I don't know approximate, but just a few months, couple of months.

Q.    So we're talking about May, June time frame?

A.    Somewhere around there.  I'm not real sure.

(Barrett. depo., pp. 58-59) (emphasis added).  Later in plaintiff's

deposition, the following questions and answers occurred:

Q.    Do you feel that I've given you a fair opportunity to talk about all your allegations of harassment?

Q.    Pretty much, yes.  I think.  I guess if there's anything else I had to say, I could have said it, but I just haven't. It's emotion, it's embarrassing and it's just something I want to forget.

9

Q.    When – well, we have talked about all your allegations of harassment, haven't we?

A.    Pretty much, yes.

Q.    See, I don't like pretty much.

        MR.  SHARP:  Well,  in  a  deposition  you  ask  her questions and she'll answer it.  I mean, you're throwing out this broad question.  Ask her questions.

BY MR. HILLER:

Q.    Sure, it's a broad question because I want to make sure I've given you a fair opportunity to talk about every incident that you claim was a problem.  And so have we talked about all the incidents?

A.    The major ones.  I'll say the major ones.  There's a few minor ones.

Q.    Well, let's talk about any minor ones that come to mind.

A.    Just some of the minor ones were just him walking by and just rubbing up against me or making –

Q.    Okay.  We talked about that, right?

A.    Yes.

Q.    Okay.  Or making what?

A.    Or making lewd comments.

Q.    Okay.  And we talked about those in <u>May</u>, <u>June of '07</u>, spring of '07, 2001 and 2002 when he came to the CAL lab or when he worked on dehum, correct?

A.    Yes.

Q.    Okay.  And nothing other than that?

A.    No.  No, I don't think so.

(Barrett depo., pp. 91-92) (emphasis added).

        Defense counsel asked plaintiff if Watwood's spring 2007

10

"surgeon" remark happened in March or April. Plaintiff responded: "I'm not sure of the exact month, but it was still kind of cool outside." (Barrett depo., p. 57).

Although plaintiff repeatedly testified that she could not recall the exact month when the later final offensive comment by Watwood occurred, she testified that it occurred "a little while later" than the previous "surgeon" comment. In response to additional questions, plaintiff testified twice that the final comment happened approximately a "couple of months" after the spring remark. When defense counsel asked plaintiff if she was "talking about the May, June time frame" as the date of the final Watwood comment, plaintiff responded: "Somewhere around there. I'm not real sure." Later, summarizing the dates of the incidents that plaintiff had previously described to be sure that he had a complete listing, defense counsel asked: "Okay. And we talked about those in May, June of '07, spring of '07, 2001 and 2002 when he came to the CAL lab or when he worked on dehum, correct." When plaintiff answered, "yes," defense counsel asked: "Okay. And nothing other than that?" Plaintiff responded: "No. No, I don't think so."

Plaintiff filed her complaint in this case on August 29, 2008 (Docket Entry No. 1-1).

Defendant asserts that, from plaintiff's testimony, the final incident of alleged harassment occurred "a little while

11

later" than, or a "couple of months" after, the earlier spring "surgeon" comment. Although plaintiff at deposition repeatedly testified that she was not sure of the exact month when this event occurred, she did not challenge the suggestion that the final remark by Watwood happened in May or June 2007.

After defendant Whirlpool filed its motion for summary judgment raising the statute of limitations defense, plaintiff filed her own declaration in opposition. (Docket Entry No. 59). In this declaration, plaintiff testified in pertinent part:

> 9. Although I cannot remember the exact date of Watwood's last harassing event, when I stated in my depositions that it was a "few months" after the April event, I was not asked for a precise date nor did I mean that it occurred in May or June of 2007. To the best of my recollection, Watwood's final act of harassment was much closer to the time of his arrest around October 18, 2007, than it was to the April harassing event. In fact it could not have been in the May/June time frame because I specifically recall that Watwood's "big 'uns" comment about my breasts occurred several weeks after the August plant shutdown. Therefore, Watwood's final comment was in or around early September 2007.

Thus, confronted with Whirlpool's motion for summary judgment, plaintiff has filed her declaration stating that, instead of being a "couple of months" or "a little while later" after Watwood's spring 2007 "surgeon" comment, she now remembers that the final "big 'uns" remark did not occur until September 2007. A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been filed, which contradicts her earlier deposition testimony. <u>Penny v. United Parcel Service</u>, 128

12

F.3d 408, 415 (6th Cir. 1997); <u>Reid v. Sears, Roebuck and Co.</u>, 790
F.2d 453, 459-60 (6th Cir. 1986); <u>Biechle v. Cedar Point, Inc.</u>, 747
F.2d 209, 215 (6th Cir. 1984). The Court in <u>Biechle</u> quoted the
Second Circuit Court of Appeals as follows:

> If a party who has been examined at length on deposition
> could raise an issue of fact simply by submitting an
> affidavit contradicting his own prior testimony, this
> would greatly diminish the utility of summary judgment as
> a procedure for screening out sham issues of fact.

<u>Perma Research & Development Co. v. Singer Co.</u>, 410 F.2d 572, 578
(2nd Cir. 1969).

As the foregoing excerpt demonstrates, plaintiff at
deposition testified repeatedly that she could not recall the exact
month of Watwood's final harassing remark, but that it happened "a
little while" after, or a "couple of months" after his earlier
"surgeon" comment, which came in the spring of 2007 when "it was
still kind of cool outside." In her declaration, plaintiff
contradicts her deposition by stating (1) that she now remembers
the month when the final comment occurred and (2) that it was "in
or around early September 2007." (Docket Entry No. 59, para. 9).

In reliance on the foregoing authority, the Court finds
that plaintiff's declaration, filed after Whirlpool's motion for
summary judgment, cannot create a genuine issue of material fact by
contradicting her deposition testimony. This finding is further
supported by the fact that plaintiff's counsel made no attempt to
rehabilitate plaintiff's testimony by cross-examination, nor did

13

plaintiff attempt to change or supplement this testimony in any manner before Whirlpool filed its motion for summary judgment.

From plaintiff's deposition testimony, although she was unable to recall the exact date of Watwood's last offensive remark, the Court finds that no reasonable jury could reasonably conclude that the last allegedly harassing act was as late as August 30, 2007. Therefore, the Court finds that plaintiff's claims filed on August 29, 2008, are barred by the one-year statute of limitations, and that Whirlpool's motion should be granted.

<u>Harassment Insufficiently Continuous, Severe or Pervasive</u>. Defendant Whirlpool maintains that the conduct of Watwood toward plaintiff, even if true, was insufficiently continuous, severe or pervasive to establish a claim for sexual harassment under the THRA.

To prevail in a sexual harassment claim, a plaintiff must prove that: (1) she is a member of a protected class; (2) she was subject to unwelcomed sexual harassment; (3) the harassment was based upon her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) defendant knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate

14

corrective action.  <u>Mullins v. Goodyear Tire & Rubber Co.</u>, 291 Fed.

Appx. 744, 746 (6th Cir. 2008).[2]

> A hostile work environment occurs "[w]hen the workplace
> is permeated with discriminatory intimidation, ridicule,
> and insult that is sufficiently severe or pervasive to
> alter the conditions of the victim's employment and
> create an abusive working environment." <u>Harris v.
> Forklift Sys., Inc.</u>, 510 U.S. 17, 21, 114 S.Ct. 367, 126
> L.Ed.2d 295 (1993) (internal quotations and citations
> omitted).  Both an objective and a subjective test must
> be met: the conduct must be severe and pervasive enough
> to create an environment that a reasonable person would
> find hostile or abusive and the victim must subjectively
> regard that environment as abusive.  See <u>id</u> at 21-22, 114
> S.Ct. 367.
>
>                   The court must consider the totality of
> the circumstances when determining whether, objectively,
> the alleged harassment is sufficiently severe or
> pervasive to constitute a hostile work environment.  See
> <u>Williams</u>, 187 F.3d at 562.  "[T]he issue is not whether
> each incident of harassment *standing alone* is sufficient
> to sustain the cause of action in a hostile environment
> case, but whether — taken together — the reported
> incidents make out such a case." <u>Id.</u>  The work
> environment as a whole must be considered than a focus on
> individual acts of alleged hostility.   See <u>id</u> at 563.
> Isolated incidents, however, unless extremely serious,
> will not amount to discriminatory changes in the terms
> and conditions of employment.   See <u>Morris v. Oldham
> County Fiscal Court</u>, 201 F.3d 784, 790 (6th Cir. 2000).
> Appropriate factors for the court to consider when
> determining whether conduct is severe or pervasive enough
> to constitute a hostile work environment "include the
> frequency of the discriminatory conduct; its severity;
> whether it is physically threatening or humiliating, or
> a mere offensive utterance; and whether it unreasonably
> interferes with an employee's work performance.

<u>Bowman v. Shawnee State University</u>, 220 F.3d 456, 463 (6th Cir.

2000).

---

[2]The THRA is a state counterpart to Title VII and claims brought under these two statutes are analyzed identically.  <u>Bailey v. USF Holland, Inc.</u>, 526 F.3d 880, 885 n.1 (6th Cir. 2008) (citing <u>Campbell v. Florida Steel Corp.</u>, 919 S.W.2d 26, 31 (Tenn. 1996)).

Plaintiff Barrett seeks to recover for Watwood's acts going back to 2001 under a "continuing violation" theory. The Sixth Circuit has recognized that "where there is an ongoing, continuous series of discriminatory acts, they may be challenged in their entirety as long as one of those discriminatory acts falls within the limitations period." Haithcock v. Frank, 958 F.2d 671, 677 (6th Cir. 1992).

Here, plaintiff complains of multiple offensive acts by Watwood while they worked together from May to October 2001 on the dehum line. However, after plaintiff transferred to the CAL lab on October 1, 2001, she and Watwood no longer worked together and she testified that she was around Watwood "infrequently." (Barrett depo., p. 76). She testified that in 2002 Watwood "chest-butted" her, and that she reported that incident to her supervisor, Mark McCool. McCool told Watwood not to come around the CAL lab anymore, and plaintiff testified that McCool's instruction was "pretty much" effective in keeping Watwood away from the lab. (Barrett depo., p. 45).

Plaintiff testified about the incidents involving Watwood in the parking lot after work and his following her in his car on one occasion during the summer of 2003, but no instances of harassment of plaintiff by Watwood occurred in 2004, 2005 or 2006. (Barrett depo., pp. 56-57). Plaintiff attempts in her brief to bridge this gap with evidence that Watwood harassed other female

16

employees, Anita Hagler and Edith Guthrie. (Docket Entry No. 57, pp. 14, 17). Discriminatory conduct directed at other employees may be considered in determining whether a hostile work environment existed <u>if</u> plaintiff becomes aware of those acts during the course of her employment. <u>See</u> <u>Hawkins v. Anheuser-Busch, Inc.</u>, 517 F.3d 321, 335-37 (6th Cir. 2008). Plaintiff at deposition was asked whether other employees were bothered by Watwood. Plaintiff responded: "I believe he bothered Margaret Goins a time or two." (Barrett depo., pp. 69-70). Plaintiff also testified that in late September 2007, shortly before Watwood's termination, she heard that a Laotian employee complained about him. (Barrett depo., p. 84). Plaintiff did not work with this employee, did not know her name, and did not know what Watwood was alleged to have said. (<u>Id.</u>) In any event, this occurrence happened after Watwood's final offensive comment to plaintiff in 2007 and cannot serve as a "bridge" between plaintiff's encounters with Watwood in summer 2003 and the next instances in spring 2007. The period of almost three years between the incidents in summer 2003 and Watwood's "surgeon" comment in spring 2007 exceeds by far any lapse in harassing conduct found to support a "continuing violations" theory in a hostile work environment case. <u>See</u> <u>e.g.</u>, <u>El-Zabet v. Nissan North America, Inc.</u>, 211 Fed. Appx. 460, 464-65 (6th Cir. 2006) (eleven-month lapse is too long to support continuing violations theory); <u>Weigel v. Baptist Hosp. of East Tennessee</u>, 302 F.3d 367, 376-77 (6th

17

Cir. 2002) (eight-month lapse too long to support continuing violations theory).

Therefore, even if one of Watwood's comments were found to have occurred within the period of the statute of limitations, the Court finds that the lapse in allegedly harassing acts between summer 2003 and spring 2007 is too great to allow plaintiff to challenge acts before spring 2007 on a continuing violations theory. If the inquiry were limited to Watwood's two remarks that occurred in 2007 (the "surgeon" comment and the "big 'uns" remark), these incidents, while offensive, boorish and inappropriate, fail to satisfy the "severe and pervasive" criteria necessary to establish a hostile work environment claim, when considered under a subjective[3] or objective standard.

Other than the buttocks touching in 2001 and, perhaps, the "chest-butting" incident in 2002[4], plaintiff did not report any of the alleged incidents involving Watwood. Plaintiff testified that from 2000 through 2008 her performance ratings were good and that she was able to do her job well. (Barrett depo., p. 93). She

_____

[3]Plaintiff testified at deposition that she failed to report either comment to Whirlpool management. (Barrett depo., 58, 61). Plaintiff was familiar with Whirlpool personnel policy requiring reporting of workplace discrimination and harassment because from August 1997 until May 2001 she had worked as a training team specialist training other Whirlpool employees on these policies. (Barrett depo., p. 34).

[4]Plaintiff at deposition testified that she believed she told her supervisor, Mark McCool, about the chest-butting incident. (Barrett depo., p. 45). However, later in the deposition she testified that she did not report this incident because she was "too embarrassed." (Barrett depo., pp. 76-77).

18

received promotions to the technical process technician ("TPT") jobs and performed those jobs up to standards until the plant closed in 2008. (<u>Id.</u>) Plaintiff never took time off work and cited Watwood as a reason for her absence. (Barrett depo., p. 94). She sought no counseling. (Barrett depo., p. 95). Plaintiff took prescription medicine to control high blood pressure, but she conceded that she had high blood pressure at least as early as 2000, before she encountered Watwood, and that high blood pressure is a hereditary condition that affects both her parents. (Barrett depo., pp. 95-96). Plaintiff never filed a charge of discrimination based upon Watwood's conduct with either the EEOC or the Tennessee Human Rights Commission. (Barrett depo., pp. 50-51).

Reviewing the totality of the circumstances, the Court finds that plaintiff's allegations of sexual harassment, even if taken as true, do not amount to the severe or pervasive misconduct necessary to create an objectively hostile or abusive work environment. Plaintiff testified that she encountered Watwood "infrequently" after she ceased working with him on the dehum line in October 2001. After the alleged "chest-butting" incident sometime in 2002, no additional instances of physical conduct by Watwood occurred. Since summer 2003, the only additional allegations of Watwood's misbehavior toward plaintiff consist of two brief vulgar remarks in 2007. Throughout this period plaintiff admits that her work performance was consistently good and that she

received promotions after which her work continued to meet standards.

For these reasons, the Court finds that there exists no genuine issue of material fact and that, as a matter of law, plaintiff has failed to make out a *prima facie* case of sexual harassment or hostile work environment.

Plaintiff's emotional distress claims. Plaintiff asserts state law claims against defendant Whirlpool for intentional and negligent infliction of emotional distress arising from conduct of Watwood.

To hold an employer liable for the acts of an employee, the plaintiff must prove (1) that the person who caused the injury was an employee; (2) that the employee was acting on the employer's business; and (3) that the employee was acting within the scope of his employment when the injury occurred. Tennessee Farmers Mut. Ins. Co. v. American Mut. Liability Ins. Co., 840 S.W.2d 933, 938 (Tenn. Ct. App. 1992). To determine whether an employee's acts are within the scope of employment, Tennessee courts often look to the Restatement (Second) of Agency, which provides in part as follows:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master; and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

20

(2) Conduct of a servant is not within the scope of employment if it is different from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228 (1957).

Applying these principles, courts have been reluctant to hold an employer liable for intentional acts of an employee that are in violation of the employer's policies. See e.g., Lester v. Cracker Barrel Old Country Store, Inc., 2004 WL 1217119 (Tenn. Ct. App. June 2, 2004 (employer not liable for employee's verbal and physical altercation with customer, prohibited by employer's rules of conduct); Powell-Lee v. HCR Manor Care, 231 Fed. Appx. 438 (6th Cir. 1007) (employer not liable for infliction of emotional distress to plaintiff allegedly resulting when fellow employee exposed himself to her; conduct clearly outside scope of employer's business and in violation of employer's work policies).

Here, it is undisputed that the alleged sexual misconduct by Watwood toward plaintiff was in violation of Whirlpool's workplace policies prohibiting sexual harassment and discrimination. Under these circumstances, the Court finds that no reasonable jury could conclude that Watwood's misbehavior toward plaintiff fell within the scope of his employment by Whirlpool. However, there are other reasons why plaintiff's state common-law tort claims must fail.

To establish a claim for intentional infliction of emotional distress under Tennessee law, (1) the conduct complained of must be intentional or reckless; (2) the conduct complained of must be so outrageous that it is not tolerated in civil society; and (3) the conduct complained of must result in serious mental injury. <u>Bain v. Wells</u>, 936 S.W.2d 618, 622 (Tenn. 1997). Tennessee courts have held that "liability for mental distress damages clearly 'does not extend to mere insults, indignities, threats, annoyances, petty oppression or other trivialities.'" <u>Id.</u> (quoting <u>Medlin v. Allied Inv. Co.</u>, 398 S.W.2d 270, 274 (Tenn. 1966).

Cases finding intentional infliction of emotional distress, also called outrageous conduct, involve conduct that is much more egregious than that which occurred here. <u>See</u> , <u>e.g.</u>, <u>Johnson v. Woman's Hospital</u>, 527 S.W.2d 133 (Tenn. Ct. App. 1975) (mother being shown her deceased baby preserved in formaldehyde jar); <u>Dunbar v. Strimas</u>, 632 S.W.2d 558 (Tenn. Ct. App. 1981) (mother being erroneously informed that her daughter's death resulted from sexual assault and suffocation); <u>Dunn v. MotoPhoto, Inc.</u>, 828 S.W.2d 747 (Tenn. Ct. App. 1991) (photo store employee informing customer that her film could not be developed when in fact the employee kept nude photographs of customer and showed them to acquaintances of customer). The facts alleged by plaintiff here, assuming them to be true, are not atypical of behavior giving

22

rise to employment discrimination cases. Even if such conduct were deemed to constitute actionable workplace discrimination, that does not automatically give rise to liability for intentional infliction of emotional distress. <u>Arnett v. Domino's Pizza I</u>, 124 S.W.2d 529, 540 (Tenn. Ct. App. 2003). Moreover, plaintiff Barnett has not established the type of serious mental injury as a result of Watwood's conduct that is required to prove intentional infliction of emotional distress. Accordingly, her claim for intentional infliction of emotional distress, or outrageous conduct, will be dismissed.

Plaintiff also seeks to hold Whirlpool liable for negligent infliction of emotional distress. The Tennessee Supreme Court has adopted a general negligence standard for claims of negligent infliction of emotional distress. A plaintiff must prove breach of duty, injury or loss, causation in fact and proximate or legal cause. <u>Camper v. Minor</u>, 915 S.W.2d 437, 446 (Tenn. 1996). In addition, the court in <u>Camper</u> limited recovery to cases demonstrating "serious" or "severe" emotional injury.

In this case, plaintiff Barrett asserts that she was "constantly on edge," "stressed," and worried about Watwood, and that she lost sleep. (Docket Entry No. 59). However, it is undisputed that plaintiff sought out no medical care or counseling for any claimed emotional distress, nor did she take any medication for any alleged emotional condition.

23

In the Court's view, plaintiff Barrett has presented insufficient evidence of a severe or serious emotional injury to present a jury question on her claim for negligent infliction of emotional distress. To that extent, this case is similar to other cases applying Tennessee law where summary judgment has been granted on grounds of insufficient proof of serious or severe emotional injury. <u>See</u> , <u>e.g.</u>, <u>Briordy v. Chloe Foods Corporation</u>, 2008 WL 587503 (M.D. Tenn. Feb. 29, 2008); <u>Dodson v. St. Thomas Hosp.</u>, 2005 WL 819725 (Tenn. Ct. App. Apr. 7, 2005); <u>Oates v. Chattanooga Pub. Co.</u>, 205 S.W.3d 418 (Tenn. Ct. App. 2006). As in these cases, plaintiff Barrett has presented insufficient evidence of serious or severe emotional injury to present a jury question on her claim of negligent infliction of emotional distress, and defendant Whirlpool, accordingly, will be granted summary judgment on this claim.

<u>**CONCLUSION**</u>

For the reasons stated above in this memorandum, defendant Whirlpool's motion for summary judgment is **GRANTED** and plaintiff's complaint is **DISMISSED**.

It is so **ORDERED**.

<u>s/ John S. Bryant</u>
JOHN S. BRYANT
United States Magistrate Judge

24